26622. TEASLEY v. THE STATE.

SUBMITTED JULY 12, 1971—DECIDED OCTOBER 7, 1971.

*John A. Darsey,* for appellant.

*Nat Hancock, District Attorney, Arthur K. Bolton, Attorney General, Harold N. Hill, Jr., Executive Assistant Attorney General, Courtney Wilder Stanton, David L. G. King, Jr., Assistant Attorneys General,* for appellee.

GRICE, Justice. Paul Teasley appeals to this court from the judgment of conviction and sentence to life imprisonment for murder and also from the denial of his motion for new trial. He was indicted by the grand jury of Barrow County and tried in the superior court of that county for the slaying of Ellen Ann Greer.

■ One of the enumerations of error insists that it was error to refuse to charge a request that "A crime is a violation of a statute of this State in which there shall be a union of joint operation of act, or omission to act, and intention, or criminal negligence." The language of this request is that of *Code Ann.* § 26-601 (Ga. L. 1968, pp. 1249, 1269). There is no merit in this enumeration since the request was amply covered in the general instruction given to the jury.

■ There is no merit in the enumeration urging that the general grounds of a motion for new trial were erroneously overruled. There was sufficient evidence to sustain the verdict of guilty of murder.

What happened on the occasion of the homicide was narrated by a large number of witnesses, yet their testimony is remarkably free from substantial conflict. Salient facts and circumstances are those which follow.

The deceased, apparently a paramour of the appellant, on Christmas Eve night drove in an automobile with the appellant and her two small children to his house, where he called his wife out to the front yard. She testified that she had never seen her husband ". . . like that. He was sick, just like a wild man, trembling, shaking. . ." She then asked the deceased, "What in the hell are you doing driving my car in my front yard with my husband? . . . You've done something to Paul. He's just crazy. . ."

Thereafter, the witnesses all testified that several shots were fired from the automobile.

A daughter summoned the police telling the officer, "Someone has got to help, I think daddy has gone crazy."

By this time the appellant and the deceased had entered the house. The deceased had noticeable bruises and cuts on her hands and head, as did he. The witnesses testified that the appellant at that time was in a highly excited condition, going from room to room, mumbling and talking incoherently.

The appellant was armed with two pistols and upon the arrival of a police officer, he fired, the bullet striking the

wall near the officer. During this period members of his family were seeking to calm and restrain him. They testified as to his long illness of hypertension, severe headaches, and blackouts.

The deceased, who was in the den, had intermittently been calling upon the appellant to help her. In response to this and at his request, members of his family from time to time checked on her condition, each time finding her alive.

About this time the appellant desired to open a metal box, which was in the den, to get some of its contents which included other firearms and ammunition. When it could not be unlocked, he fired one of his pistols so as to break the lock. The evidence does not show whether the bullet richocheted from striking the metal box.

A pathologist, who examined the deceased's body, testified that her death was caused by a bullet entering her neck and chest cavity and lodging in her skull. As to whether it appeared that this bullet had previously struck a metal object such as the box, he testified that "the bullet did not show that type of mutilation. It showed it had passed through a bone. . ." However on cross examination this witness acknowledged that he did not mean to say "that this absolutely excluded all possibility of its richocheting and changing direction. This would all depend on the object which you are talking about."

When the shot was fired at the box, the deceased was lying on the floor in the same room and only a few feet from the box.

Witnesses testified that they made a search of the room seeking to find evidence of the bullet's entry but did not find anything as to this.

An officer testified that the bullet found in the deceased's body was fired from one of the pistols which the appellant had in his possession on this occasion.

After shooting off the lock, the appellant continued in his highly excited demeanor but finally acceded to the request of one of the police officers to accompany him. Thereupon he handed his weapons to the police and rode with the

officers to jail.

On the way to the police car he "blacked out" and fell to the ground.

In the meantime, an ambulance had reached the appellant's home where it was found that the deceased had died.

While the foregoing testimony as to what occurred at the time of the homicide may be subject to various deductions, it was adequate to authorize the jury to find that the victim was killed from a shot fired from the appellant's pistol by a bullet passing through her neck and chest cavity while she was lying on the floor and that it had not struck anything before entering her body.

Therefore the evidence was such that the jury could conclude that the appellant killed the deceased as a result of malice and not by accident, involuntary manslaughter or by reason of insanity, and therefore was guilty of murder.

■ The appellant enumerates as error the failure of the trial court to charge on the law of accident as a defense for crime as embodied in *Code Ann.* § 26-602 (Ga. L. 1968, pp. 1249, 1269) which provides as follows: "A person shall not be found guilty of any crime committed by misfortune or accident where it satisfactorily appears there was no criminal scheme or undertaking or intention or criminal negligence."

From a study of the evidence, we have concluded that this request should have been given to the jury.

The evidence as summarized in Division 2 was sufficient to submit to the jury the question of whether the death of the victim was a result of a bullet richocheting and accidently striking her when the appellant fired a pistol in the deliberate act of knocking the lock off a box which he wanted to open. *Coleman v. State*, 208 Ga. 511 (67 SE2d 578). See also *Jordan v. State*, 154 Ga. 390 (2) (114 SE 349) (2 Justices dissenting); *Willingham v. State*, 169 Ga. 142 (a) (149 SE 887).

■ Appellant also enumerates as error the refusal to give in charge the law as to involuntary manslaughter as provided in *Code Ann.* § 26-1103 (b) (Ga. L. 1968, pp. 1249,

1276), defining involuntary manslaughter. This section states: "A person commits involuntary manslaughter in the commission of a lawful act in an unlawful manner when he causes the death of another human being, without any intention to do so, by the commission of a lawful act in an unlawful manner likely to cause death or great bodily harm. A person convicted under this subsection shall be punished as for a misdemeanor."

From the circumstances of the homicide as referred to above, the evidence was ample to raise an issue for the jury's consideration as to the defense of manslaughter. It was sufficient to authorize the jury to consider whether the victim's death was a result of the appellant's lawfully firing the pistol in an unlawful manner, in close proximity to the victim so as to cause the bullet to richochet and strike her.

The ruling has long been that where there is ". . . evidence from which the jury would have been authorized to find the accused guilty of involuntary manslaughter in the commission of a lawful act without due caution and circumspection, it [is] error for the judge to omit to instruct the jury on the law relating to that grade of manslaughter." *Jackson v. State,* 181 Ga. 753 (2) (184 SE 279). See also *Drake v. State,* 221 Ga. 347 (2) (144 SE2d 519).

■ Three enumerations relate to refusal to give charges with reference to a defense of insanity.

The first request was a verbatim reproduction of *Code Ann.* § 26-702 providing: "A person shall not be found guilty of a crime, if at the time of the act, omission, or negligence constituting the crime, such person did not have mental capacity to distinguish between right and wrong in relation to such act, omission, or negligence."

The second request was as to delusional insanity, quoting *Code Ann.* § 26-703 which provides: "A person shall not be found guilty of a crime when at the time of the act, omission, or negligence constituting the crime, such person, because of mental disease, injury, or congenital deficiency, acted as he did because of a delusional compulsion as to such act which overmastered his will to resist committing

the crime."

The third request was a quotation from *Roberts v. State,* 3 Ga. 310, 326, which states in material part that in order to be found guilty a person must be able "to distinguish between right and wrong in regard to the particular act about to be done."

While there was no evidence as to delusional insanity so as to require a charge on that principle, the evidence was ample to require one on the law of insanity, as to distinguishing right from wrong, as embodied in the first and third of the foregoing requests.

In this connection it should be pointed out that on the night in question there was testimony that the appellant was "sick . . . like a wild man . . . shaking and trembling . . . completely out crazy . . ."

This was sufficient to authorize the jury to consider whether his behavior was attributable to insanity or to other causes which would not excuse him from the homicide.

■ The appellant likewise enumerates as error the re-charge given by the trial court after it refused to allow publication of a verdict of involuntary manslaughter as first found by the jury, contrary to instructions. It is contended that this re-charge was an indication by the judge that the appellant was guilty of murder and thereby prejudiced the jury in its consideration of the outcome of the case. It is unlikely that this situation will recur upon a re-trial. Therefore it is not necessary to pass upon this enumeration.

■ Likewise, it is not necessary to deal with those enumerations of error dealing with failure of the court reporter to file a transcript of the record for preparation of the appellant's motion for new trial since this case is being reversed and a new trial ordered.

In view of the rulings in Divisions 3, 4, and 5 as above stated, the judgment of the trial court is

*Reversed. All the Justices concur.*