29083. ROSS v. THE STATE.

ARGUED SEPTEMBER 10, 1974 — DECIDED NOVEMBER 18, 1974 —
REHEARING DENIED DECEMBER 17, 1974.

*Sam J. Gardner, Jr.,* for appellant.
*H. Lamar Cole, District Attorney, Arthur K. Bolton, Attorney General, David L. G. King, Jr., Assistant Attorney General,* for appellee.

GRICE, Chief Justice.

The appellant Willie Ross was tried in the Superior Court of Colquitt County on counts of kidnapping, armed robbery and murder, was convicted and received sentences of 20 years, life imprisonment and death, respectively. The case is before this court on appeal from the judgments of conviction and for mandatory review of the death penalty imposed upon the murder conviction.

The state's evidence showed essentially the following. The appellant and three other persons, Freddie Lee King, Rudy Turner and Theodore Ross, who was the appellant's brother, planned to rob the Clover Farms Highway Grocery in Moultrie, Georgia; that on the afternoon of August 23, 1973, they drove to Moultrie from Madison, Florida, and staked out the store; and that they followed the individual who closed the store to a nearby home in which J. R. Stanford and his family lived and then drove back to Madison.

It was further shown that the following evening the four men returned to the Stanford residence and, wearing stocking masks, entered the house and held the Stanford family at gunpoint; that they "ransacked" the house, collecting money, jewelry and Stanford's .32 caliber pistol; that they demanded the grocery store money and were told that it was in the possession of Robert Lee who lived nearby, but that Wandell Norman, Stanford's son-in-law and Lee's partner in the grocery store, would be returning to the Stanford home with his wife later that

night; that when Norman and his wife arrived Norman was immediately subdued by the intruders and Theodore Ross and King ordered him to take them to Lee's house to get the money; that they also took to Lee's house with them Stanford's 14-year-old stepdaughter; and that the appellant and Turner stayed behind at the Stanford residence.

It was also revealed that when Theodore Ross, King, Norman and the girl arrived at the Lee home, Lee's young son answered their knock and let them in; that they proceeded directly to Lee's bedroom and Norman switched on the light; that Lee awakened and Norman told him that Theodore Ross and King were there to get the store money; that Lee immediately reached for his pistol and began firing into the hallway where Theodore Ross and King were standing; that either Theodore Ross or King returned fire and grabbed one of the two small boys in the house, threatening to kill the boy if Lee did not stop firing and hand over the money; that Norman then gave King the store money box, containing approximately $20,000 in cash and checks; and that Theodore Ross and King fled the house on foot. Norman then telephoned the police and informed them of what had just occurred at the Lee residence and also told them to send a car to the Stanford residence.

Thereupon, Moultrie Police Lieutenant Tommie Meredith responded to the call, arriving at the Stanford home minutes later with Officer Frank Lynch close behind him in another police car. Lynch testified that when Meredith entered the kitchen door he confronted Turner who was armed with a pistol, crouching at the opposite end of the dining room table; that the appellant, also armed with Stanford's .32 caliber pistol, was positioned in front of a refrigerator located in the dining room; that Turner said to Meredith, "I've got them right in here," and motioned for one of the Stanford family members to come to him; and that when words were exchanged between Meredith and Turner the Stanford family took the opportunity to flee into a bedroom.

According to the testimony of both Stanford and Officer Lynch, two rounds from Meredith's shotgun were fired, followed immediately by a pistol shot. The appellant

and Turner then ran through the back yard with Lynch firing at them as they fled. Lynch found Meredith's body lying on the kitchen floor, shot through the chest at point blank range.

Turner's pistol was subsequently found fully loaded in the back yard and the cartridge in the firing chamber bore an indentation indicating that it had misfired. The .32 caliber pistol in the appellant's possession was found next to the back yard fence, one round having been fired. It was determined later that Meredith was killed with this pistol.

Shortly after the foregoing gunfire, the appellant told his brother Theodore, who testified for the state, that he had shot a policeman and that Turner's gun had misfired. He also told another witness, Bobby Gamble, that he believed he had killed a policeman.

The appellant was apprehended several months later and indicted for the kidnapping of Wandell Norman, for the armed robbery of Robert Lee and for the murder of Lieutenant Tommie Meredith.

No evidence was presented by the defense.

■ The appellant makes a general attack on the constitutionality of the death sentence imposed under Ga. L. 1973, pp. 159-172 (Code Ann. § 27-2534.1 et seq.) as being cruel and unusual punishment according to Furman v. Georgia, 408 U. S. 238 (92 SC 2726, 33 LE2d 346). Without discussing this issue the appellant merely adopts the arguments which were raised by the appellant in *Eberheart v. State,* 232 Ga. 247 (206 SE2d 12). This court upheld the constitutionality of the statute in the *Eberheart* case, following the prior decisions of *Coley v. State,* 231 Ga. 829 (204 SE2d 612), and *House v. State,* 232 Ga. 140 (205 SE2d 217). We are not persuaded that the decisions in those cases should be reconsidered.

■ This court is required by Ga. L. 1973, pp. 159, 165 (Code Ann. § 27-2537 (c, 3)) to determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." The appellant contends that this provision denies him equal protection of the laws in terms of Griffin v. Illinois, 351 U. S. 12 (76 SC 585, 100 LE 891, 55 ALR2d 1055), since he is unable, as an indigent, to

obtain the records of the evidence and sentences of the cases used by this court as a standard of review.

We do not agree.

The records of all prior, similar cases which this court uses as a standard of review are available for inspection by all defendants, indigent or otherwise, as a part of the public records of this court. It cannot be assumed that court-appointed counsel would not undertake an adequate comparative investigation on behalf of his client of the sentences in similar cases either by resort to the printed reports of prior decisions or by an exhaustive, detailed study of the records of all prior similar cases.

As recently stated by the United States Supreme Court, "The fact that a particular service might be of benefit to an indigent defendant does not mean that the service is constitutionally required. The duty of the State under our cases is not to duplicate the legal arsenal that may be privately retained by a criminal defendant in a continuing effort to reverse his conviction, but only to assure the indigent defendant an adequate opportunity to present his claims fairly in the context of the State's appellate process." Ross v. Moffitt, — U. S. — (94 SC 2437, 41 LE2d 341).

The appellant also asserts that the standard of review imposed by Code Ann. § 27-2537 contemplates a comparative investigation only of those cases in which an appeal was taken; and that this procedure creates a double sentencing standard and amounts to a denial of due process as defined by United States v. Jackson, 390 U. S. 570 (88 SC 1209, 20 LE2d 138), in that it arbitrarily excludes from this court's consideration all capital felony cases from which no appeal was taken and all potential death cases in which the defendant pleaded guilty to a lesser offense.

This argument cannot be sustained.

The double sentencing standard in the Jackson case involved a statutory scheme under the Federal Kidnapping Act which effectively penalized a defendant for asserting his right to trial by jury. However, Code Ann. § 27-2537 does not relate to the alternatives available to a defendant when he is called upon to enter his plea, but instead concerns the standard to be used by this court in

reviewing the death sentence regardless of whether it was imposed after a guilty or a not guilty plea.

The statutory requirement that this court determine whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases provides a defendant with an added safeguard from the imposition of an arbitrary sentence. This purpose is ably served by reference to appeal cases which represent a sufficient cross section of similar cases upon which an adequate comparative review can be made.

We further note that nothing in the statute forecloses this court during the course of its independent review from examining non-appealed cases and cases in which the defendant pleaded guilty to a lesser offense.

The appellant's contention that because Code Ann. § 27-2537 authorizes this court to compare the sentences in cases decided prior to Furman v. Georgia, 408 U. S. 238, supra, the new procedure perpetuates reliance upon an unconstitutional standard of review, is likewise not valid.

In *Coley v. State,* 231 Ga. 829, 834, supra, this court considered the question of "whether Georgia's new system can be employed without arbitrary application of the death penalty found to be fatal under the system extant at the time the Furman decision was rendered." We there stated that the essential factor was that the discretion to be exercised in the imposition of the death penalty "is controlled by clear and objective standards so as to produce non-discriminatory application."

Under the former statutory scheme there were no standards to check potential abuses of discretion and arbitrary application of the death penalty. Therefore, there were no *standards,* constitutional or otherwise, which could be perpetuated.

The new statute, however, contains three standards which control the sentencer's discretion. Code Ann. § 27-2537 (c, 1, 2 and 3). The comparative sentence review, which is one of these, is designed to aid in this court's determination of how prior sentencers have responded to acts similar to those committed by the defendant whose case is being reviewed. It is the reaction of the sentencer to the evidence before it which concerns this court and which defines the limits which sentencers in past cases have

tolerated, whether before or after Furman v. Georgia. When a reaction is substantially out of line with reactions of prior sentencers, then this court must set aside the death penalty as excessive.

In our view, the comparative sentence review thus serves as an additional and final check on the limits of the sentencer's now considerably controlled discretion.

■ The appellant bases his final enumeration of error upon the standards of jury selection applicable in death cases as set forth in Witherspoon v. Illinois, 391 U. S. 510, 522, supra, and as amplified in Boulden v. Holman, 394 U. S. 478 (89 SC 1138, 22 LE2d 433) and Maxwell v. Bishop, 398 U. S. 262 (90 SC 1578, 26 LE2d 221), that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." See also, *Miller v. State,* 224 Ga. 627 (8) (163 SE2d 730); *Simmons v. State,* 226 Ga. 110 (12) (172 SE2d 680).

In the present case, the voir dire examination of the veniremen was not in the transcript as it was originally transmitted to this court on appeal. It appears that the appellant did not request the trial court to direct the court reporter to transcribe the voir dire proceedings. Nor did there appear in the record, as originally submitted, any suggestion that the veniremen were in fact excluded in violation of the Witherspoon standards. It was not until the appellant's appearance before this court that the issue of the omission of the voir dire proceedings from the trial transcript was raised.

Ordinarily, this issue would be determined according to the established procedural rules that an attack made upon the method of selecting a jury cannot be made for the first time after verdict (*Mitchell v. State,* 225 Ga. 656 (2) (171 SE2d 140)), and that it is the obligation of the party who asserts error to show it affirmatively by the record. *Kemp v. State,* 226 Ga. 506 (2) (175 SE2d 869).

In our view, however, this court must address itself to the Witherspoon issue here, although belatedly raised by the appellant, because the independent review required by Code Ann. § 27-2537 requires that we examine

the entire record of proceedings in the trial court notwithstanding that a particular error may not be assigned by the appellant. See *House v. State,* supra.

Moreover, the United States Supreme Court appears to have held that a transcript of the voir dire proceedings must be included in the record in cases where the death penalty is imposed.

In Funicello v. New Jersey, 403 U. S. 948 (91 SC 2278, 29 LE2d 859), the petitioner sought post-conviction relief from imposition of the death penalty based upon the Witherspoon issue and on the double sentencing standard involved in United States v. Jackson, 390 U. S. 510, supra. The New Jersey Supreme Court denied the requested relief because no transcript of the voir dire had been submitted either on the review or on direct appeal from the judgment of conviction and the testimony of the veniremen was never transcribed. In a memorandum opinion the United States Supreme Court reversed the judgment insofar as it imposed the death sentence and remanded for further proceedings, citing the Witherspoon, Boulden, Maxwell and Jackson cases.

Our review of the voir dire transcript, which was ordered to be sent up to this court, reveals that only one prospective juror was excused for cause based upon his views as to capital punishment. The transcript shows the following colloquy: "Court: Are you stating to this court that regardless of what the evidence is in this case, what the evidence may show, that you still would refuse to impose the death penalty? (Venireman): Yes." Having made it unmistakably clear that he would oppose imposition of the death penalty regardless of what transpired at the trial, this venireman was properly excused for cause. See *Simmons v. State,* supra; *Miller v. State,* supra.

We find no violation of the Witherspoon standards for jury selection.

■ We have undertaken a thorough review of the record and conclude that the evidence fully supports the findings of guilt on all three counts.

With respect to the death sentence imposed upon the murder conviction, the jury found that the murder was accompanied by the following statutory aggravating

circumstances: (1) "The offense of murder was committed while the defendant was engaged in the commission of another capital felony"; and (2) "The offense of murder was committed against a Peace Officer while such Peace Officer was engaged in the performance of his official duties."

According to the standards prescribed for our review by Code Ann. § 27-2537 (c), we conclude further that the sentence of death was not imposed under the influence of passion, prejudice or any other arbitrary factor; that the evidence supports the jury's findings of aggravating circumstances as provided in Code Ann. § 27-2534.1 (b, 2, 8) and that a comparative sentence review reveals that the death sentence is neither excessive nor disproportionate to sentences imposed in similar cases. The collection of cases which we have used as a basis for comparison is attached as an appendix to this opinion.

We find no error in the proceedings.

*Judgments affirmed. All the Justices concur, except Gunter, J., who dissents.*

#### APPENDIX.

Similar cases considered by the court: *Johnson v. State,* 226 Ga. 378 (174 SE2d 902); *Callahan v. State,* 229 Ga. 737 (194 SE2d 431); *Whitlock v. State,* 230 Ga. 700 (198 SE2d 865); *Bennett v. State,* 231 Ga. 458 (202 SE2d 99); *Smith v. State,* 230 Ga. 876 (199 SE2d 793); *Lingerfelt v. State,* 231 Ga. 354 (201 SE2d 445).